# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **DAVID WAYTON and JAMIE COX, personal representative of the Estate of David Wayton,** | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action Number **2:12-cv-838-AKK** |
| v. | ) ) | |
| **UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST,** | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Jamie Cox and David Wayton[1] filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, challenging Defendant United Mine Workers of America 1974 Pension Trust Trustees' decision to deny him disability pension benefits. Before the court are UMWA's motions for summary judgment and for leave to file excess pages, and Wayton's motion to continue or deny summary judgment. Docs. 38, 44, 46. The

---

[1] Cox replaced Wayton as the personal representative of Wayton's estate after Wayton's counsel filed a Suggestion of Death. Docs. 24, 25; January 25, 2013 text order. Nevertheless, for the sake of consistency, the court will refer only to Wayton.

motions are briefed and ripe for resolution.[2]  Docs. 42, 45.  For the reasons stated below, summary judgment is due to be granted.

I. **WAYTON'S RULE 56(d)[3] MOTION TO CONTINUE OR TO DENY DEFENDANT'S SUMMARY JUDGMENT MOTION**

Wayton moves the court under Rule 56(d) to deny summary judgment because he has not had an opportunity to obtain discovery of information outside the administrative record.  Doc. 44.  Basically, Wayton is attempting to re-litigate the motion to compel the court denied previously.  Docs. 26, 34.  For the same reasons the court stated in its April 4, 2013 order, doc. 34, and Wayton's failure to establish that the Trustees relied on information outside of the administrative record, the court **DENIES** Wayton's motion.

II. **STANDARD OF REVIEW**

Rule 56's general principle that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," has limited application here because the district court "sits more as an appellate tribunal than as a trial court" and

---

[2] The motion for leave to file excess pages is **GRANTED** since UMWA's reply brief addressed Wayton's response and motion to continue or deny Defendant's summary judgment motion.  Doc. 46.

[3] Although Wayton cites Rule 56(f), the 2010 revision of Rule 56 resulted in the former section (f) currently designated as section (d).

"evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002).  To that end, the court is guided by the Eleventh Circuit's six-step sequential framework for reviewing ERISA benefit denials, which requires the following:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision was "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo wrong*," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo wrong*" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Williams v. Bellsouth Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance*, 542 F.3d

1352 (11th Cir. 2008); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 123-24 (2008); *Blankenship v. Metro. Life. Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). This court's review of the Trustees' decision is limited to "consideration of the material available to the administrator at the time it made its decision." *Blankenship*, 644 F.3d at 1354, citing *Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1140 (11th Cir. 1989). Furthermore, the claimant has the burden of proving entitlement to ERISA benefits. *Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1248 (11th Cir. 2008).

## III.   FACTUAL BACKGROUND

Wayton, a former mine helper for Jim Walters Resources and beneficiary under the National Bituminous Coal Wage Agreement of 1974 and the United Mine Workers of America 1974 Pension Plan and Trust ("the Plan"), challenges the Plan Trustees' denial of his application for disability pension benefits. The Trustees reached this decision based on a determination that Wayton's workplace injury was not causally related to his Social Security Administration ("SSA") disability award. Docs. 39-2 at 2; 41-1 at 51.

### A.   *Wayton's workplace injury and medical treatment*

On April 10, 1997, Wayton informed his supervisor that he had "pull[ed] on a heavy object and felt pain in [his] right hip and upper leg radiating down to [his]

foot." Docs. 41-2 at 23; 41-10 at 6-7; 41-1 at 51.  Wayton visited the Bessemer Carraway Medical Center's emergency room the next day and an x-ray revealed early foci of degenerative arthritis and possible narrowing of the right hip joint.  Doc. 41-2 at 24.  A physician diagnosed Wayton with possible severe hip strain, prescribed pain mediation, and released Wayton to return to work.  *Id*. at 22-23.

A week later, Dr. Gaylon Rogers evaluated Wayton for hip, leg, and calf pain that radiated to Wayton's toe, ordered a MRI that revealed an L4-L5 "concentric disc bulge with a right paramedian disc herniation that causes compression of the right L5 nerve root within the lateral recess," and recommended that Wayton "remain off work at the moment."  Doc. 41-2 at 25, 27.  Wayton subsequently underwent two procedures to treat his pain:  an epidural block in April that improved his pain, and a laminectomy and microdiskectormy on June 2, 1997, that revealed a herniation nucleus polposus.  Doc. 41-2 at 28, 31, 34.  When Wayton returned in mid-June for a follow-up visit, Dr. Rogers noted that Wayton was "doing excellent" and ordered physical therapy.  Doc. 41-2 at 36.  A month later, Dr. Rogers released Wayton to return to light duty.  Doc. 41-2 at 42.

Wayton returned to Dr. Rogers on August 18, 1997 and reported an increase in pain as a result of performing house work a week earlier.  Doc. 41-2 at 47.

Consequently, Dr. Rogers recommended Wayton remain off work and ordered an epidural block, which failed to improve Wayton's pain. Docs. 41-2 at 47, 48; 41-3 at 1. A MRI conducted on September 10, 1997 showed a "recurrent disc at the L4-5 level covered with scar tissue. This recurrent disc is exerting mass effect on the thecal sac at this level and obliterating the right lateral recess." Doc. 41-3 at 2. The MRI results led to a second laminectomy and discectomy that revealed "recurrent herniated nucleus pulposus." *Id*. at 5. The procedure resulted in Wayton "feeling good." *Id.* at 7.

In light of Wayton's continued improvement, Dr. Rogers released Wayton to return to work on January 12, 1998. Doc. 41-3 at 19. However, in April 1998, Dr. Rogers ordered Wayton to suspend work temporarily and resume physical therapy due to a back injury Wayton sustained while lifting a jackhammer. Doc. 41-3 at 25, 27. When Wayton returned two months later, Dr. Rogers remarked that the "impression from therapy is that [Wayton] is able to perform slow, deliberate movement, but still guarding some. This leads to a question as to whether he will be able to go back to work. The patient definitely want to and needs to, I think." Doc. 41-3 at 32. Later that month, after receiving an epidural block and reporting worse pain in a "very severe way," *id*., Wayton decided to undergo a laminectomy/discectomy with rayed threaded fusion, *id*. at 38.

### B.     *Wayton's cerebrovascular episodes*

Sometime before the procedure, Wayton visited a clinic complaining of low back pain, episodes of numbness on his mouth, and a loss of his peripheral vision. Doc. 41-3 at 23.  After being admitted to Bessemer Carraway Hospital, Wayton received a CT scan that was "suspicious for a possible small infarct in the left occipital lobe." *Id*. at 40.  A physician discharged Wayton three days later with a diagnosis of "cerebrovascular accident, left occiput." *Id*. at 43.  This condition prevented Wayton from receiving the repeat laminectomy/discectomy.

On December 15, 1998, Wayton again presented to Bessemer Carraway complaining of "[left] arm and chest numbness."  Doc. 41-4 at 14.  A head CT and brain MRI revealed a large lucunar infarction in the left basal ganglia. *Id.* at 19-20, 26.  Dr. Peter Lane, who treated Wayton, noted "symptoms [that] largely resolved on the Heparin" and discharged Wayton two days later with a diagnosis of "cerebrovascular accident." *Id*. at 24.

The medical record in 1999 also shows that Wayton was diagnosed with cerebral lesions that likely represent strokes.  Docs. 41-4 at 45, 47.  Wayton was also treated for CNS lyme disease. *Id*. at 48.  Apparently, as a result of these ongoing issues, Wayton informed Dr. Rogers on February 3, 1999 that he "elected to proceed with attempting to procure SSI . . . ." *Id*. at 42.  As for Wayton's back

pain, Dr. Rogers noted that the

> *proposed spinal stabilization might or might not let him return to work in the mines, but as a practical matter, he is not able to pursue that at this point for non work-related medical reasons.* Therefore, I would consider him at this point at a [maximum medical improvement] status at least for the time being with a 10-20% permanent impairment based on the back problems.

*Id*. (emphasis added).

    C.    *Wayton's SSA disability insurance benefits and UMWA disability pension benefits applications*

Wayton applied for SSA disability insurance benefits in February 1999, alleging a disability onset date of April 22, 1998, due to back problems and strokes. Doc. 41-5 at 30. The SSA approved Wayton's claim, finding that Wayton "became disabled under [the SSA] rules on July 1, 1998." Doc. 41-5 at 16; 41-2 at 64. However, the SSA reached this decision solely on the evidence regarding the strokes. Specifically, the SSA listed Wayton's primary diagnosis as organic mental disorders, secondary diagnosis as "late effects of cerebrovascular disease," and noted in the remarks section that Wayton met Listing 12.02, i.e. organic mental disorders. Doc. 41-10 at 11.

After the SSA approved his application for disability benefits, Wayton applied for disability pension benefits through the UMWA Plan on January 13, 2000. Doc. 41-9 at 44-50. Under the Plan, disability pension benefits are

available to a

> Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident [ ]. *A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act . . . .*

Doc. 39-2 at 6 (emphasis added). Therefore, the Plan requires a causal link between the mine accident and claimed disability. Doc. 43 at 2. To determine whether a causal link exists, the Plan's pension processing manual instructs the Trustees to consider, among other things, the applicant's "SSDI determinations and the correlation between the effective date of the SSDI award and the most recent mine accident" and medical records. *Id*. However, under the Plan, a physician's statement regarding the applicant's disability "is not necessarily conclusive" and is given weight based on "the extent to which it is supported by specific objective clinical findings and its consistency with other evidence in the file." *Id*.

Ultimately, the Plan Trustees denied Wayton's application because Wayton's

> Social Security disability benefits were not based upon his back condition. His disability benefits were based upon "organic mental disorders and late effects of cerebrovascular disease," conditions related to his repeated cerebrovascular accidents (strokes). There is

>  no relationship between these conditions and the April 10, 1997
>  mining accident.

Doc. 41-10 at 1-2.  The Trustees subsequently denied Wayton's appeal because Wayton "was not disabled due to the mining accident."  Doc. 41-1 at 47 through 41-2 at 12.

## IV.   ANALYSIS

Since the UMWA admits that Wayton suffered a mining accident and is totally disabled, the issue before this court is whether Wayton's disability is the result of a mining accident.  In resolving this issue, the court must utilize the Eleventh Circuit's sequential framework to review the Trustees' decision.  For the reasons stated below, the court needs to only reach the first step since the evidence supports the Trustees' decision to deny Wayton's claim.

### A.   *The Trustees' benefits denial decision was correct*

Under the Plan, Wayton is eligible for pension disability benefits only if his mining accident is the basis of his disability, or combined with a later condition to cause his disability.  Docs. 43 at 2-3.  Therefore, the court begins with a review of the SSA disability determination and notes that, although Wayton stated in his application for SSA disability insurance benefits that his disability began on April 22, 1998 due to back problems and strokes, doc. 41-5 at 30, the SSA found only

that Wayton had a disability because of his strokes.  According to the SSA, Wayton "became disabled under [the SSA] rules on July 1, 1998," doc. 41-5 at 16; 41-2 at 64, i.e. the period when Wayton's first cerebrovascular event occurred, as reflected by Wayton's complaint of numbness on his mouth and a loss of peripheral vision.  Doc. 41-3 at 23.  Wayton's physicians ultimately diagnosed these symptoms as a "cerebrovascular accident," i.e. stroke.  Since the medical evidence preceding July 1 consisted exclusively of Wayton's back condition, the SSA either rejected it in assessing Wayton's disability or never reached the issue.  Significantly, the SSA's disability determination form records Wayton's primary diagnosis as Listing 12.02, organic mental disorders.  Doc. 41-20 at 11.  Therefore, although Wayton applied for disability benefits based on his back condition *and* strokes, the SSA found only that his strokes met the disability standard.

In light of this finding, Wayton can only receive UMWA pension disability benefits if he establishes that his work related back injury was "aggravated or compounded by" his strokes, "and the two combined conditions result[ed] in total disability *as determined by the [SSA]*."  Doc. 43 at 3 (emphasis added).  Unfortunately for Wayton, there is no evidence before this court for it to find that the Trustees erred when they determined that Wayton failed to make this showing.

In fact, Wayton failed to present any evidence to suggest that his back injury exacerbated his strokes or that his back condition factored in the SSA's determination. Without more, this court has no basis to infer that the SSA determined that Wayton's back injury in combination with the strokes was disabling.

      B.     *Dr. Rogers' opinions fail to support Wayton's disability claim*

The evidence also does not support Wayton's contention that Dr. Rodgers opined that Wayton's back injury rendered him disabled. In fact, the record establishes that Dr. Rogers never rendered a determination on this issue. For example, in February 1999, Dr. Rogers noted that the "proposed spinal stabilization might or might not let [Wayton] return to work in the mines, *but as a practical matter, he is not able to pursue that at this point for non work-related medical reasons*. Therefore, I would consider him at this point at a [maximum medical improvement] status at least for the time being with a 10-20% permanent impairment based on the back problems." Doc. 41-4 at 42 (emphasis added). Presumably the "non-work related medical reasons" included Wayton's strokes since Wayton first reported a loss of vision and numbness in July 1998. In any event, Dr. Rogers' determination that the proposed stabilization procedure could allow Wayton to return to work and that Wayton was at maximum medical

improvement "at least for the time being" suggests that Dr. Rogers viewed Wayton's condition as temporary and anticipated that Wayton's back injury could improve. In other words, the February 1999 opinion does not support Wayton's contention.

Likewise, Dr. Rogers' November 2000 statement that he could "validate the fact that [Wayton] had a significant lumbar spine problem which in all likelihood would have prevented him from returning to work and heavy labor underground regardless of the presence or absence of the cardiovascular difficulties," doc. 41-2 at 13, also does not establish that Wayton had a disabling condition. As a threshold matter, Dr. Rogers rendered this opinion after the Trustees denied Wayton's claim. Moreover, even if Dr. Rogers had made this statement before the Trustees reviewed Wayton's claim, the Plan is explicit that the Trustees only give deference to a medical opinion when the evidence is "consisten[t] with other evidence in the file." Doc. 43 at 2. No such deference would have been warranted here because of the inconsistency between Dr. Rogers' statements and the SSA's disability determination. Furthermore, Dr. Rogers' opinion is not dispositive because, even if Wayton's back injury prevented him from returning to his former position as a mine helper, that fact alone does not establish that Wayton met the SSA's disability standard. In fact, the SSA considers a series of factors to

determine disability, including age, education, past relevant work, the severity of the impairment, and the presence of transferable skills, *see* 20 C.F.R. § 404.1520, none of which Dr. Rogers addresses.  Therefore, Dr. Rogers' opinion fails to establish that Wayton's back injury rendered him disabled or supports a conclusion that the back injury caused Wayton's cerebrovascular condition or combined with his strokes to render him disabled.

      C.     *Wayton's claim that UMWA breached its fiduciary duty*

Wayton contends that the Trustees breached their fiduciary duty by ignoring the medical evidence and failing to request additional evidence or contact Wayton's health care providers.  *See* doc. 10 at 7; 29 U.S.C. § 1104.  This issue is not properly before this court because Wayton failed to allege a breach of fiduciary duty claim in his complaint and is foreclosed from adding it at this juncture.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004).  Moreover, any such claim would fail since the Trustees were not required to request additional information or contact Wayton's physicians because, ultimately, Wayton has the burden of establishing that he is entitled to ERISA benefits.  *See Glazer*, 524 F.3d at 1248.  Finally, the claim would fail also because the record supports the Trustees' decision.

## V.  CONCLUSION

Based on a review of the record, the court finds that the Trustees' decision was reasonable and is due to be affirmed. Therefore, by separate order, the court will grant UMWA's motion for summary judgment

Done the 4th day of November, 2013.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE